

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable J. K. Brim, President
Board of Regents for Texas State College for Women
Denton, Texas

Dear Sir:

> Opinion Number O-4321
> Re: Whether Board of Regents of
> Texas State College for Women
> may lease college building to
> government contractors for use
> of enlisted men of U. S. Army
> Air Force.

We have received your letter of recent date which
we quote, in part, as follows:

"The Board of Regents of the Texas State
College for Women, better known as College of
Industrial Arts, has been requested to enter
into an agreement with the Harte Flying Ser-
vice, contractors for the Army Air Force, to
lease them certain buildings belonging to the
college which have been used for dormitory
space for co-operative homes for students, and
also to supply meals for enlisted men of the
Army Air Force to be enrolled or are enrolled
in a Glider Pilot Training course to be trained
near Denton.

"I am enclosing a copy of a verbal proposal
submitted to the Board and also a copy of a
contract with the Harte Flying Service of Wichita,
Kansas has with the Fort Hays Kansas State Col-
lege at the present time, or rather did have,
which expired on the 31st day of August, and
this school is the school they want dormitories
at Denton, Texas.

"1. Can the Board of Regents lease the property belonging to the College on a basis to these parties which they propose to lease?

"2. Can the Board of Regents open this dormitory space and teaching facilities to other than for the education of white girls as provided in the original act creating this school?

"3. Can the Board of Regents operate a dining hall for the men students attending and occupying, using the equipment and facilities of the College as proposed in this contract and receive pay for same?"

You enclosed with your letter of request copies of the verbal proposal and the contract mentioned therein. We will not copy these instruments in this opinion, but will refer to them when need arises therefor.

The College of Industrial Arts was created in 1901 by the Twenty-seventh Legislature (Chapter 32, House Bill No. 35; see also Articles 2624-2628a, Vernon's Annotated Civil Statutes.)  Section 1 of House Bill 35 provides that "an industrial institute and college is hereby established for the education of white girls in the arts and sciences * * *". (Emphasis supplied).

Articles 2626 and 2627 provide, respectively, as follows:

"The board of regents shall possess all the powers necessary to the establishment and maintenance of a first-class industrial institute and college for the education of white girls in this State in the arts and sciences, at which such girls may acquire a literary education, together with a knowledge of kindergarten instruction, telegraphy, stenography and photography, drawing, painting, designing and engraving, in their industrial application,

Honorable J. K. Brim, page #3

needle-work, including dressmaking, book-
keeping, scientific and practical cooking,
including a chemical study of food, practi-
cal housekeeping, trained nursing, caring
for the sick, the care and culture of chil-
dren, with such other practical industries
as, from time to time, may be suggested by
experience, or tend to promote the general
object of said institute and college, to-
wit: Fitting and preparing such girls for
the practical industries of the age. Acts
1901, p. 306."

"The board of regents shall appoint a
president and professor of said college and
such other officers and employees as they
may think proper, and fix their salaries not
to exceed the salaries paid professors in any
one department at the Agricultural and Mechani-
cal College; and make such rules and regula-
tions for the government of said officers as
they may deem advisable. They shall regulate
rates of tuition, together with course of dis-
cipline necessary to enforce the faithful dis-
charge of the duties of all officers, professors
and students; divide the course of instruction
into departments, so as to secure a thorough
education and the best possible instruction in
all of said industrial studies, selecting care-
ful and efficient professors in each department,
and shall adopt all such rules, by-laws and regu-
lations as they may deem necessary to carry out
all the purposes and objects of said institu-
tion. Id."

We see that the college was established for the edu-
cation of white girls in the industrial courses named. We
see that the board of regents is empowered to adopt such
rules and regulations "as they deem necessary to carry out
all the purposes and objects of said institution".

You wish to know whether the board of regents may lease certain buildings owned by the college to a government contractor which buildings will be used by enlisted men of the Army Air Force for dormitory, office, and class-room purposes. These buildings are across the street from the campus proper. You wish to know also whether under the lease contract the board of regents may make provision for the supplying of meals to such men in the Senior Mess Hall in the Home Economics Building, as set out in the verbal proposal.

We are of the opinion that no authority exists for the board of regents to enter into such a contract. Mani-festly, such a contract would in no way aid in carrying out the "purposes and objects of said institution". On the other hand, we think that it could be reasonably contended that the entering and execution of such a contract would be in viola-tion of both the letter of and the spirit behind the law. Obviously the college could not admit men students. It is reasonable to presume that many parents send their daughters to the college for the reason that it is not a coeducational institution. It is a college for "white girls". Parents may in the exercise of sound judgment determine that their daugh-ters should attend a girls' school. Clearly this was one of the reasons for limiting the enrollment to girl students. The use of the buildings and facilities of the college by the en-listed men would certainly accomplish many of the same results should male students as such be admitted to the college. Can the board of regents by contract do indirectly what it cannot do directly? We think not. We do not believe that authority exists for such action; it follows that the board of regents may not enter into such lease agreements. Fort Worth Cavalry Club v. Sheppard, 125 Tex. 339, 83 S. W. (2d) 660.

It may be contended that Article 2628a permits the board to enter such contracts. This article authorizes the construction and equipment of dormitories or other improve-ments, to issue obligations in payment thereof, and pledge

the revenues of the improvements as security therefor.
Section 4 of Article 2028a reads as follows:

> "Said Board of Regents is further author-
> ized and empowered to sell and/or encumber any
> part of the campus or real estate owned by said
> college as may be deemed advisable by said
> Board of Regents, for the purpose of obtaining
> funds with which to erect and/or equip such im-
> provements, or for the purpose of further secur-
> ing the payment of its obligations issued to any
> person, firm or corporation, for the erection
> and/or equipping of such improvements; and said
> Board of Regents shall have and is hereby given
> full and complete power to adopt such rules and
> regulations as to said Board of Regents may be
> deemed reasonable, requiring any class or class-
> es of students to reside in such dormitories, and/or
> other buildings, and absolute and sole management
> and control of such dormitories and other improve-
> ments is vested in said Board of Regents."

It may be contended that the lease contract under
consideration is authorized under the power of the board to
"encumber any part of the campus or real estate owned by said
college". However, we think that this provision should be
read in harmony with the other provisions or statutes relat-
ing to the college. We do not believe that the Legislature
intended that Section 4 could be used to alter the intrinsic
character of the institution. The purpose of Article 2028a
was to provide a means whereby dormitories could be construct-
ed and paid for; therefore, this article should be construed
with such purpose in mind. We do not believe that authority
to enter a lease contract like the one under consideration is
granted by the article.

It will be noted that Section 4 grants the power to
sell or encumber the property for the purpose of obtaining
funds with which to erect or equip the improvements or to pay
obligations issued therefor. We quote the following from the
copy of the verbal proposal which you have furnished us:

Honorable J. K. Brim, page #6

"The exact amount of this charge for room
and board will have to be determined on the
basis of actual cost to the school to include
any overhead that might be attendant to fur-
nishing these services".

It could hardly be contended that such charges are
to be made to obtain funds to pay either for improvements
or on obligations issued therefor.

Another possible contention is that such a lease
contract is authorized under the terms of Articles 2625 and
2585a, Vernon's Annotated Civil Statutes. Among other things,
Article 2625 provides as follows:

" * * * The Board of Regents shall have the
power incident to their position and to the
same extent, so far as may be applicable and
shall receive like compensation as is con-
ferred by law on the regents of the State
University; * * *". (Emphasis supplied).

Article 2585a reads as follows:

"The Board of Regents of the University of
Texas is directed to request the War and Navy
Departments of the United States of America
to establish and maintain courses of military
and naval training, qualifying men student
graduates of such courses for reserve commis-
sion awards, as a part of its curriculum. The
Board of Regents is authorized to enter into
mutually agreeable contracts for such pur-
poses.

"The work of the students enrolling in such
courses may be credited toward degree require-
ments under such regulations as the Board of
Regents may prescribe.

> "No student of the University shall ever
> be required to take any portion of such train-
> ing as a condition for entrance into the Uni-
> versity or graduation therefrom. Acts 1941,
> 47th Leg., p. 479, ch. 302, Sec. 1)". (Em-
> phasis supplied).

You will notice that under that part of Article 2625, above quoted, the power is granted only "so far as may be applicable." We do not believe that Article 2585a is applicable to the Texas State College for Women.

In the first place, the article is applicable only to men students. The work of such students may be credited toward degree requirements. The emergency clause of the statute reads, in part — "The fact that every college man should be taught the meaning of discipline, the power of confidence, the value of self-control, * * * " (emphasis supplied). Obviously, this statute cannot be construed to apply to the Texas State College for Women because of the fact that it does not have, nor can it have, under the law, men students. Having reached the conclusion that Article 2585a is not by its provisions applicable to your college, we do not have to determine whether the article is expressly limited to the State University by the words, "The Board of Regents of the University of Texas * * * ". (Emphasis supplied).

In view of the foregoing, you are respectfully advised that your questions 1, 2 and 3 are answered in the negative.

APPROVED SEP 11, 1942

_Gerald C. Mann_
ATTORNEY GENERAL OF TEXAS

Very truly yours

ATTORNEY GENERAL OF TEXAS

By _George W. Sparks_
George W. Sparks
Assistant

GWS-a

APPROVED
OPINION
COMMITTEE
BY _____
CHAIRMAN